IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| State Farm Fire and Casualty Company, | ) | Civil Action No. 0:12-00151-MBS |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Kim M. Nivens, Ronald B. Nivens, | ) | |
| Laurie Hatcher, Hope L. Hubbard, | ) | |
| David Burton Wright, Thomas Stephen | ) | |
| Jones, Tia Jones, Joshua Lane Carpenter, | ) | |
| and Christina Queen, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This cases arises out of a three-vehicle accident that occurred on September 29, 2011, when

a bull owned by Defendants Kim M. Nivens ("Mrs. Nivens") and her husband, Ronald B. Nivens

("Mr. Nivens") (together the "Nivenses" or "Mr. and Mrs. Nivens") escaped a pasture and entered

a highway.  A number of individuals sustained personal injury and/or property damage as a result

of colliding with the bull (the "Accident").  On January 16, 2012, Plaintiff State Farm Fire and

Casualty Company ("Plaintiff" or "State Farm") filed this action against Mr. and Mrs. Nivens and

the injured parties, Defendants Laurie Hatcher ("Hatcher"); Hope L. Hubbard ("Hubbard"); David

Burton Wright ("Wright"); Thomas Stephen Jones ("Thomas Jones"); Tia Jones; Joshua Lane

Carpenter ("Carpenter"); and Christina Queen ("Queen") (collectively "Defendants").  Plaintiff seeks

a declaration that it does not have an obligation to defend and/or indemnify Mr. and Mrs. Nivens

under a homeowners insurance policy (the "Policy") it issued to the Nivenses.  Specifically, Plaintiff

asks the court to declare that the Policy does not require it to either defend the Nivenses "for any

action brought against them or provide[] coverage to pay any claim of any person who sustained

property damage or bodily injury" as a result of the Accident.  ECF No. 1, at 6.  In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02 D.S.C., the matter was referred to United States Magistrate Judge Shiva V. Hodges for pretrial handling.[1]

On November 13, 3012,  Plaintiff moved for summary judgment, to which Defendants filed responses in opposition.[2]  On April 17, 2013, the Magistrate Judge issued a Report and Recommendation in which she recommended that the court deny Plaintiff's motion for summary judgment.  Plaintiff filed objections to the Report and Recommendation on May 2, 2013.  By order dated August 12, 2013, the court denied Plaintiff's motion for summary judgment.  The case proceeded to a bench trial, which was held on November 20, 2013.

The court has viewed the witnesses and considered their testimony, examined the exhibits and depositions admitted at trial, and thoroughly reviewed the applicable law. The court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 2201, and makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a) and 57.[3]

---

[1]The matter was referred to the Magistrate Judge because the Nivenses and Queen are proceeding pro se.  See Local Rule 73.02(B)(2)(e) D.S.C.

[2]On November 30, 2012, Wright and Hubbard filed separate responses in opposition to Plaintiff's motion for summary judgment.  That same day, Defendants Carpenter, Hatcher, Thomas Jones, and Tia Jones filed a joint response in opposition, stating that they "join in and rely upon the arguments raised in" Hubbard's response in opposition.  On February 28, 2013, the Nivenses responded to Plaintiff's motion for summary judgment, indicating that they rely upon the arguments raised in Hubbard's response in opposition.

[3]To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any conclusions of law constitute findings of fact, they are so adopted.

## I. **FINDINGS OF FACT**

1.  In 1997 or 1998, Mr. Nivens purchased a five acre tract of land (the "Nivens Property") from
    his grandparents, Marshall Fred Douglas ("Mr. Douglas"), who now is deceased, and Dolly
    Mae Douglas ("Mrs. Douglas") (together "Mr. and Mrs. Douglas").  Transcript of Bench
    Trial ("Tr.") 24, 29, ECF No. 153.  The Nivens Property is located on Beamguard Road in
    Clover, South Carolina.  Mr. and Mrs. Douglas lived on, and owned, the tract of land ("DMD
    2") next to the Nivens Property, which lies to the east.  Mr. and Mrs. Douglas also owned a
    tract of land ("DMD 1") across Beamguard Road to the north (together, "DMD 1" and
    "DMD 2" are referred to as the "Douglas Property").  The entire Douglas Property currently
    is composed of approximately 73.51 acres.  DMD 2 is comprised of approximately 40 acres,
    of which 25 to 30 acres is a fenced pasture.  Tr. 27.  Mr. Nivens' parents live on a parcel of
    land adjoining the Nivens Property to the east.  Mr. Nivens' sister and her family reside on
    a parcel of land continuous with DMD 1 to the north of the Nivens Property.  Pl. Ex. 15.

2.  The Nivenses began constructing a home on the Nivens Property in 1998.  During the
    construction of the Nivenses' home, Mrs. Nivens applied for homeowners insurance with
    State Farm.  Tr. 74.  On the homeowners insurance application (the "Application") dated
    December 4, 1998, Mrs. Nivens indicated that there was one pet in the household, a mixed
    breed husky, and that there was no business conducted on the Nivens Property.  Pl. Ex. 1.
    Thereafter, State Farm issued Mrs. Nivens the Policy.  The Policy was renewed each year and
    was in full force and effect at all times relevant to this action.  See Pl. Ex. 2.  Over the years,

the Nivenses have accumulated horses, goats, chickens, dogs, and cats for the enjoyment of the family and for the children's 4-H Club[4] activities.  Tr. 90, 97.

3.    In April 1999, the Nivenses finished construction of their home where they, along with their three children, have lived ever since.  The Nivenses and their children have engaged in a variety of activities on both the Nivens Property and the Douglas Property, including horse trail rides, hunting, fishing, and riding go-carts and four-wheelers.  Tr. 98.  The Nivenses pasture their horses on DMD 2.  Depo. of Kim M. Nivens, 35, ECF No. 82-2.  The Nivenses, in essence, treat the Douglas Property as their own.  Tr. 98-99.

4.    Prior to his death, Mr. Douglas raised cattle in DMD 2 and grew hay in the pastures of DMD 1 and DMD 2.  In 2007, Mr. Douglas fractured his hip and could no longer care for the cattle.  As a result, Mr. and Mrs. Douglas gave Mr. Nivens four cows in exchange for replacing a fence, caring for the cattle, and cultivating and cutting hay, some of which Mr. Nivens stored in a barn located on DMD 1.  Tr. 13-15, 32-33, 38.

5.    Mr. Douglas died in September 2008.  Mrs. Douglas, who retains sole ownership of the Douglas Property, gave the remaining five cows to Mr. Nivens pursuant to a handwritten agreement that reads:

> Official Wishes of Dolly A. Douglas
> Regarding – agreement regarding cattle
>
> 2007        Brent Nivens is given Four (4) cows in exchange for replacing fence around pasture between Beamguard Rd & Highway 55.

---

[4] 4-H is an international youth development organization.  See http://www.4-h.org/ (found Sept. 15, 2014).

4

| | |
|---|---|
| Feb 2009 | Brent Nivens is given Five (5) cows in exchange for returning to Dolly A Douglas two (2) calves yearly until Dolly A Douglas decides no further calves are needed as payment.  Brent Nivens has full use of said pasture and is responsible for care of cattle and upkeep of the said pasture. |
| Signed | Dolly A. Douglas.  2-25-2009 |
| Witnessed | Kay D. Nivens 2-25-09 Frederick G. Douglas 2-25-09 |

Pl. Ex. 5.

6.      According to Mr. Nivens, nothing really changed as far as his day-to-day care of the cattle and the land, except that the cows now all belonged to him.  Tr. 35.  Mr. Nivens would breed his cows to produce calves.  Mr. Nivens would keep some heifers to replace some of the older cows, and would sell the older cows and some calves.  Tr. 35.  Mr. Nivens purchased a bull in 2010 or 2011 to breed cattle.  Mr. Nivens maintained a herd size of between ten to fifteen cows.  Tr. 35-36.

7.      Each year, from 2008 through 2011, Mr. Nivens sold two calves at the "sale barn" under Dolly Douglas's name, the proceeds of which were issued directly to her by check.  Tr. 55, 79.  During that same period of time, Mr. Nivens sold approximately 10 cows for himself and continued to maintain the Douglas Property.  Tr. 14.  The Nivenses never made a profit on the cows because the sales of the cows did not cover expenses of fuel, fertilizer, fencing, and so forth.  Tr. 42-43.  The cows were a source of pleasure to Mr. Nivens.  Tr. 44, 62, 89.  He felt that the keeping of cattle is a family tradition and a labor of love.  Tr. 57.  The cattle were pastured on DMD 1 from 2007 until they all were sold after the Accident.  Tr. 69.

8.     As a result of their farming and cattle raising activities, the Nivenses incurred substantial expenses. The Nivenses sought to cover their expenses by claiming their cattle breeding and farming activities as a business on their joint federal income tax returns (the "joint tax returns"). Tr. 16, 107-09.

9.     Mrs. Nivens prepared the Nivenses' joint tax returns for 2008, 2009, and 2010 (the "relevant tax years"), which she had done every year of their marriage. During the relevant tax years, the Nivenses reported on Schedule F (Internal Revenue Service ("IRS") Form 1040), Profit or Loss From Farming, the following losses: $22,317 in 2008; $14,025 in 2009; and $18,401 in 2010. Tr. 93-94. Pl. Ex. 7, 8, 9. On each Schedule F, the Nivenses indicated that they materially participated in the operation of a business, describing their principal product as cattle. Tr. 16-18, 80; Pl. Ex. 7, 8, 9.

10.    Further, during the relevant tax years, the Nivenses claimed depreciation deductions for their farming equipment on IRS Form 4562, Depreciation and Amortization. According to the joint tax returns for 2008 and 2010,[5] the Nivenses' farming equipment and several cows were 100% business use in 2008, with the exception of a golf cart (80% business use) and a Ford F-350 pick up truck (98.22% business use). Pl. Ex. 7. Further, the 2010 depreciation report indicates that the Nivenses' farming equipment, several cows, the golf cart, and the Ford F-350, were all 100 % business use. Tr. 18-20, Pl. Ex. 9.

11.    Mrs. Nivens, who prepared the tax returns, did not read the instructions for Schedule F and is not aware of how the IRS defines "materially participating in the operation of a business."

---

[5]The depreciation reports for 2008 and 2010 are the only such reports submitted in evidence.

Tr. 87.  Mrs. Nivens is not aware of how the Policy defines "business" or how South Carolina law defines "business."  Tr. 87.

12.    The Nivenses do no advertising for a cattle business, have no website for a cattle business, have no business plan or business license for a cattle business, keep no separate telephone number or address for a cattle business, and have no employees to help with the cattle.  Tr. 88-89.  Both Mr. and Mrs. Nivens have full time jobs outside the home.  Tr. 89.  They kept no ledger or business records, although they kept separate bank accounts, one for household expenses and another for expenses appertaining to the cows, horses, chickens, goats, and other animals owned by the Nivenses.  Tr. 40-41.  They kept receipts for costs related to the cows.  Tr. 42.

13.    On the evening of September 29, 2011, the Nivenses' bull escaped the fenced in pasture on DMD 1.  The bull proceeded onto the adjacent highway, South Carolina Highway 55 ("SC 55"), and was struck by three vehicles driven by Hubbard, Wright, and Hatcher.  Tr. 45-46.  The Nivenses did not file a Schedule F in 2011 after the Accident.  Tr. 110.

14.    In pertinent part, the Policy provides that:

DEFINITIONS

.  .  .  .

2.    "business" means a trade, profession or occupation. This includes farming.

.  .  .  .

5.     "insured location" means:

a.    the residence premises;

b.    the part of any other premises, other structures and grounds used by you as a residence. This includes premises, structures and grounds you acquire while this policy is in effect for your use as a residence.

c.    any premises used by you in connection with the premises included in 5.a or 5.b;

d.    any part of a premises not owned by an insured but where an insured is temporarily residing;

e.    land owned by or rented to an insured on which a one or two family dwelling is being constructed as a residence for an insured;

f.    individual or family cemetery plots or burial vaults owned by an insured;

g.    any part of a premises occasionally rented to an insured for other than business purposes;

h.    vacant land owned by or rented to an insured. This does not include farm land; and

i.    farm land (without buildings), rented or held for rental to others, but not to exceed a total of 500 acres, regardless of the number of locations.

### SECTION II - LIABILITY COVERAGES

**COVERAGE L - PERSONAL LIABILITY**

If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage to which this coverage applies, caused by an occurrence, we will:

1.    pay up to our limit of liability for the damages for which the insured is legally liable; and

2.    provide a defense at our expense by counsel of our choice. We may make an investigation and settle any claim or suit that we decide is appropriate. Our obligation to defend any claim or suit ends when the amount we pay for damages, to

effect settlement or satisfy a judgment resulting from the occurrence, equals our limit of liability.

. . . .

SECTION II - EXCLUSIONS

1.    Coverage L . . . coverage do[es] not apply to:

. . . .

b.    *bodily injury or property damage arising out of business pursuits of any insured* or the rental of any part of any premises by any insured.  This exclusion does not apply:

(1)  to activities which are ordinarily incident to non-business pursuits.

(2) with respect to Coverage L to the occasional or part-time business pursuits of an insured who is under 19 years of age.

(3)    to the rental or holding for rental of a residence of yours:

(a) on an occasional basis for the exclusive use as a residence;

(b) in part, unless intended for use as a residence by more than two roomers or boarders; or

(c) in part, as an office, school, studio or private garage;

(4)    when the dwelling on the residence premises is a two,  three or four family dwelling and you occupy one part and rent or hold for rental the other part; or

(5)    to farm land (without buildings), rented or held for rental to others, but not to exceed a

9

       total of 500 acres, regardless of the number of locations;

   . . . .

   d. *bodily injury or property damage arising out of any premises currently owned or rented to any insured which is not an insured location.* This exclusion does not apply to bodily injury to a residence employee arising out of and in the course of the residence employee's employment by an insured.

   . . . .

Pl. Ex. 2 (emphasis added).

15. Plaintiff contends the issues presented in this declaratory judgment action are as follows:

   a. Does the Business Pursuits Exclusion apply to avoid coverage under the State Farm Policy?

   b. Does the bodily injury or property damage arise out of the premises currently owned or rented to the insureds which is not an insured location?

Mot. for Summ. J. 5, ECF No. 77-1.

## CONCLUSIONS OF LAW

1. In South Carolina, insurance policies are contracts subject to the general rules of contract construction. See B.L.G. Enters., Inc. v. First Fin. Ins. Co., 514 S.E.2d 327, 330 (S.C. 1999) (citing cases). As such, courts "must give policy language its plain, ordinary, and popular meaning." Id. (citing Fritz-Pontiac-Cadillac-Buick v. Goforth, 440 S.E.2d 367, 369 (S.C. 1994)). "[I]f the intention of the parties is clear, courts have no authority to torture the meaning of policy language to extend or defeat coverage that was never intended by the parties." S.C. Farm Bureau Mut. Ins. Co. v. Kennedy, 700 S.E.2d 258, 261 (S.C. Ct. App.

2010) (quoting <u>MGC Mgmt. of Charleston, Inc. v. Kinghorn Ins. Agency</u>, 520 S.E.2d 820, 823 (S.C. Ct. App. 1999)).  However, "if doubt exists as to the extent or fact of coverage," South Carolina courts have long held that "where the clause is one of inclusion it should be broadly construed for the benefit of the insured while in exclusion cases the same clause is given a more restricted interpretation[]."  <u>Buddin v. Nationwide Mut. Ins. Co.</u>, 157 S.E.2d 633, 635 (S.C. 1967) (citing <u>Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.</u>, 146 S.E.2d 410, 414 (N.C. 1966)); <u>see also</u> <u>M & M Corp. v. Auto-Owners Ins. Co.</u>, 701 S.E.2d 33, 35 (S.C. 2010) ("Policies are construed in favor of coverage, and exclusions in an insurance policy are construed against the insurer.") (citing <u>Buddin</u>, 157 S.E.2d at 635).  This does not mean that insurers do not have the right "to limit their liability and to impose conditions on their obligations." <u>S.C. Farm Bureau</u>, 638 S.E.2d at 104 (citing <u>B.L.G. Enters.</u>, 514 S.E.2d at 330).  They may do so, "provided they are not in contravention of public policy or a statutory prohibition."  <u>Id.</u>  The insured bears the burden of proving that a claim is covered by a policy, while the insurer bears the burden of establishing exclusions to coverage. <u>Sunex Int'l Inc. v. Travelers Indem. Co.</u>, 185 F. Supp. 2d 614, 617 (D.S.C. 2001); <u>Gamble v. Travelers Ins. Co.</u>, 160 S.E.2d 523, 525 (S.C. 1968).

2.   As an initial matter, the court notes that Plaintiff does not contend the Policy does not provide coverage for bodily injury or property damage.  Rather, Plaintiff contends coverage is not available because the exclusions articulated in Paragraphs 1(b) and (d) of the "Exclusions" section of the Policy apply.  The court will address each issue raised by Plaintiff in turn.

3.    **Business Pursuit** - Exclusions, Paragraph 1(b).  "The purpose of the exclusion is simple; it is intended to limit liability coverage for activities which otherwise would require specialized underwriting and rating, thus keeping homeowner's insurance rates at reasonable levels." Black v. Fireman's Fund Am. Ins. Co., 767 P.2d 824 (Idaho Ct. App. 1989) (citing Annot., Construction and application of "business pursuits" exclusion provision in general liability policy, 48 A.L.R.3d 1096, 1098–99 (1973), superseded by Annot., Construction and application of "business pursuits" exclusion provision in general liability policy, 35 A.L.R.5th 375 1996)).

4.    In State Auto Prop. & Cas. Ins. Co. v. Raynolds, 592 S.E.2d 633 (S.C. 2004), the South Carolina Supreme Court addressed the question of what constitutes a "business pursuit" for purposes of homeowner's insurance policy.  In Raynolds, the insureds, Mr. and Mrs. Raynolds, bred, reared, and sold Akita show dogs beginning in 1989.  The insureds attended between 40 and 70 dog shows a year and were members of the Akita Club of America.  The insureds converted the garage of their house into a bathing and grooming facility, purchased a specialized canine treadmill, constructed kennels for their dogs, and purchased a recreational vehicle for the purpose of transporting themselves, their dogs, and their equipment to dog shows.  The insureds deducted costs of raising, training, and showing the dogs as business expenses and depreciated some items on their tax returns.  They advertised their puppies for sale under the name "Ko-Akita Kennels,"  for which entity they also had business cards.  The insureds grossed $5,000 to $12,000 per year on their dog operation.  Id. at 635.  In 1996, one of their dogs bit a handler at the insureds' home.  State Auto Property & Casualty Insurance Company ("State Auto") sought a declaratory judgment seeking to

12

deny coverage under the "business pursuits" exclusion in the insureds' homeowner's policy. The exclusion provided that State Auto would not cover medical payments to others for bodily injury "arising out of or in connection with a business engaged in by an insured. This exclusion applies but is not limited to an act or omission regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the business." Id. The trial court found in favor of the insureds. State Auto appealed.

5.  In Raynolds, the South Carolina Supreme Court adopted the two-prong test developed in Fadden v. Cambridge Mut. Fire Ins. Co., 274 N.Y.S.2d 235 (N.Y. 1966), to evaluate whether an activity constitutes a "business pursuit" for purposes of an insurance policy exclusion, i.e.:

> To constitute a business pursuit, there must be two elements: first, continuity, and, secondly, the profit motive; as to the first, there must be a customary engagement or a stated occupation; and, as to the latter, there must be shown to be such activity as a means of livelihood, gainful employment, means of earning a living, procuring subsistence or profit, commercial transactions or engagement.

Fadden, 274 N.Y.S.2d at 240 (citing cases).[6]

Also in Raynolds, the South Carolina Supreme Court observed that in Shapiro v. Glen Falls Ins. Co., 365 N.Y.S.2d 892, 893 (1975), the New York Court of Appeals held

---

[6] In Fadden, the insured's teenage son offered to help an independent contractor who had been hired by the insured to clear land. The independent contractor thereafter sustained serious leg injuries when he was struck by a power saw operated by the son. The insurer asserted that a homeowner's policy did not apply because the injuries were sustained in furtherance of the insured's business venture on the land, and thus fell within a clause excluding coverage "to any business pursuit of an insured." Id. at 239-40. The Fadden court concluded that the exclusion did not apply because there was no proof of continuity or profit as to the son, who had used the power saw only four to six times for a few minutes each time prior to the accident, received no pay, and was not involved in the insured's business venture.

that, "for the purposes of the 'business pursuit' exclusion, the 'business' engaged in by [the insured] need not necessarily be limited to his sole occupation or employment . . . ."  Thus, a part-time activity may constitute a business pursuit for insurance coverage purposes. Raynolds, 592 S.E.2d at 636.

6.  Regarding the first prong of the test, the Raynolds court observed that the insureds had been breeding, showing, and selling Akitas for almost fifteen years, that Mr. Raynolds spent approximately 120 hours per month caring for the dogs, that Mr. Raynolds attended dog shows two or three times per month for approximately two to three days per show, and that the insureds had spent a considerable amount of time customizing their property to care for the dogs.  Based on these facts, the supreme court determined that, even though not undertaken on a full-time basis, the insureds' activities represented a "customary activity or stated occupation" within the meaning of Shapiro.  Regarding the second prong of the test, the supreme court found that, while the insureds never made an actual profit from selling the dogs, the fact that they filed losses for "Profit or Loss from Business" under Schedule C of their federal income tax return showed evidence of a profit motive.  Id. at 636-37 (citing cases).  Further, the supreme court noted that the insureds showed dogs in an attempt to build the dogs' reputation, which increased the value of the dogs for purposes of stud fees and breeding prices; that they publicly advertised the sale and breeding prices of their dogs under the name "Ko-Akita Kennels"; and that they had sold puppies for substantial amounts of money. Id. at 637.  The Raynolds court determined that these factors established the "activity as a means of livelihood, gainful employment, means of earning a living, procuring subsistence or profit, commercial transactions or engagement" portion of the test.

Accordingly, the supreme court held that the insurer properly denied coverage pursuant to an enforceable exclusion.

7.    The court finds the facts of <u>Raynolds</u> to be distinguishable from the within action.  The court agrees that, during the time he had cattle, Mr. Nivens customarily engaged with the herd in that he routinely checked on the cattle, maintained the pasture and fencing, and generally saw to the health and welfare of the animals.  However, unlike the insureds in <u>Raynolds</u>, the Nivenses' conduct does not rise to the level of a profit motive.  In that respect, only the fact that they sought to recoup costs through claiming farming losses and depreciation on their income tax returns demonstrates a profit motive.  As stated hereinabove, the Nivenses did not advertise, did not have any kind of a business plan, and possessed no business cards.  There also is no evidence that the Nivenses took steps to upgrade the quality of their cattle or to increase the size of their herd in order to maximize profits.  They did not expend sums to modify or improve any of the Douglas Property or the Nivens Property in order to accommodate the cows.

8.    As to the income tax returns, the court finds instructive 26 C.F.R. § 1.183-2, "Activity not engaged in for profit defined."  In determining whether deductions are allowable as business expenses, the IRS will analyze:

> (1) Manner in which the taxpayer carries on the activity. The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Similarly, where an activity is carried on in a manner substantially similar to other activities of the same nature which are profitable, a profit motive may be indicated. A change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive.

(2) The expertise of the taxpayer or his advisors. Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Where a taxpayer has such preparation or procures such expert advice, but does not carry on the activity in accordance with such practices, a lack of intent to derive profit may be indicated unless it appears that the taxpayer is attempting to develop new or superior techniques which may result in profits from the activity.

(3) The time and effort expended by the taxpayer in carrying on the activity. The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may also be evidence that the activity is engaged in for profit. The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity.

(4) Expectation that assets used in activity may appreciate in value. The term profit encompasses appreciation in the value of assets, such as land, used in the activity. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation. See, however, paragraph (d) of § 1.183–1 for definition of an activity in this connection.

(5) The success of the taxpayer in carrying on other similar or dissimilar activities. The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable.

(6) The taxpayer's history of income or losses with respect to the activity. A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained

16

beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit. A series of years in which net income was realized would of course be strong evidence that the activity is engaged in for profit.

(7) The amount of occasional profits, if any, which are earned. The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent. An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. However, substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small. Moreover, an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated.

(8) The financial status of the taxpayer. The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved.

(9) Elements of personal pleasure or recreation. The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. On the other hand, a profit motivation may be indicated where an activity lacks any appeal other than profit. It is not, however, necessary that an activity be engaged in with the exclusive intention of deriving a profit or with the

17

intention of maximizing profits. For example, the availability of other investments which would yield a higher return, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit. An activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit. Also, the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors whether or not listed in this paragraph.

9.    In this case, the Nivenses do not carry on the activity in a businesslike manner. They keep no books and records, other than receipts for food, medicines, and the like. There is no evidence that Mr. Nivens changed techniques other than to purchase a bull to make it easier to produce offspring. Also, the Nivenses cannot be said to have extensive expertise in cattle farming's business, economic, and scientific practices. The cows appear to have been raised in substantially the same manner as they were raised by Mr. Douglas prior to his death. As to time and effort expended on the cattle, Mr. Nivens testified that he spent only a limited time caring for the cows. Both Mr. and Mrs. Nivens are generally employed full-time outside the home. On those occasions when Mr. Nivens was laid off from his position, his primary responsibility was caring for the children and the residence. There is no evidence that the cows were anticipated to appreciate in value, unlike the show dogs in Raynolds; there also is no evidence that the Nivenses engaged in activities in the past that they converted to profitable enterprises, such that they expected to convert the cattle breeding and sales into a profitable venture. Further, the Nivenses never received a profit from the sale of cows, and did not expect to; rather, the Nivenses relied on other sources of income to support their family. Finally, and most importantly, the cattle were a source of enjoyment to Mr. Nivens

18

and constituted a way of life passed down from his grandfather and generally to be anticipated in a rural community.  Mr. Nivens testified that both he and his grandfather had always enjoyed "messing" with cows.  Tr. 42.

10.     The court concludes that the Nivens were not engaged in a "business pursuit of any insured" for purposes of the Policy exclusion.[7]

11.     **Insured Location** - Exclusions, Paragraph 1(d).  The question presented is whether DMD 1, the tract of land from which the bull escaped on the night of the Accident, is an insured location under the Policy.  To answer this question, the court must determine whether DMD 1 is an "insured location." i.e., whether DMD 1 was used by the Nivenses "in connection with" the Nivens Property.

12.     The Policy does not define the word "premises."  Guided by the general principles of contract construction set forth above, the court first determines whether DMD 1 constitutes a "premises."  According to Black's Law Dictionary, 6th ed. (1991), the word "premises," in the context of estates and property, is defined as "[l]and with its appurtenances and structures thereon."  In addition, Webster defines "premises" as "[l]and and the buildings on it."   Webster's II New College Dictionary (1995).   Furthermore, in making this determination, the court recognizes the context of this case and the other language in the contract–particularly the Policy's definition of "residence premises," which is in accord with the common definitions noted above.  Consistent with the common usage of the term, the context of this case, and the other language in the Policy, the court finds that DMD 1

---

[7]The court offers no opinion regarding the permissibility of the Nivens' deductions on their income tax returns in the 2008-2010 time period.

constitutes a "premises," as it consists of a pasture and at least one structure, the barn used for storing hay.

13.    The court has located no South Carolina precedent interpreting a homeowner's policy in which the "insured location" is defined as "any premises" used "in connection with" the residence premises." However, the Court of Appeals of Utah recently discussed various tests courts have developed to determine whether a location is used in connection with residence premises. See Am. Nat'l Prop. & Cas. Co. v. Sorensen, No. 20110221-CA, 2013 WL 6503310 (Utah Ct. App. Dec. 12, 2013). Among these tests are the "repeated use," "integral use," and the "property ownership and legal right to use" tests. Id. at *5. Thus, courts have looked at whether an insured repeatedly used the area where the accident occurred in connection with the residence. Id. at *6 (citing Allstate Ins. Co. v. Drumheller, 185 F. App'x 152 (3d Cir. 2006); Farmers New Century Ins. Co. v. Angerson, No. 4:04-CV-2608, 2008 WL 238622 (M.D. Pa. Jan. 22, 2008); Nationwide Mut. Ins. Co. v. Prevatte, 423 S.E.2d 90 (N.C. Ct. App. 1992); State Farm Fire & Cas. Co. v. MacDonald, 850 A.2d 707 (Pa. Super. Ct. 2004)). In other cases, courts have looked to whether the accident occurred in a location that was integral to the insured's use of the residence. Id. (citing Uguccioni v. U.S. Fid. Guar. Co., 597 A.2d 149 (Pa. Super. Ct. 1991); Northern Sec. Ins. Co. v. Rossitto, 762 A.2d 861 (Vt. 2000)). Other courts determine whether the insured has a legal right to the site of the accident, i.e., whether the site was owned publicly, or privately by someone other than the insured. Id. (citing United Servs. Auto. Ass'n v. Parry, 761 P.2d 157 (Ariz. Ct. App. 1988); Arrowood Indem. Co. v. King, 39 A.3d 712 (Conn. 2012); Elliott v. State Far Fla. Ins.

Co., 61 So. 3d 502 (Fla. Dist. Ct. App. 2011); <u>Shelter Mut. Ins. Co. v. Davis</u>, No. 05-0456, 2006 WL 929239 (Iowa Ct. App. Apr. 12, 2006)).

14. Other tests include the "foreseeable use" test, in which the court will examine (1) the character of the use as a residentially related activity; (2) the distance between the residence and the site; and (3) the resulting reasonable foreseeability of the risk of the connected activity on the site to the insurer, <u>Arrowood Indem.</u>, 605 F.3d at 74 (citing <u>Utica Mut. Ins. Co. v. Fontneau</u>, 875 N.E.2d 508 (Mass. Ct. App. 2007)); and the "actual use" test, which occurs when insureds actually use a piece of property "in connection with" their residence premises, <u>id.</u> at 75 (citing <u>Royal Indem. Co. v. King</u>, 512 F. Supp. 2d 117 (D. Conn. 2007)).

15. In <u>Sorensen</u>, the Court of Appeals of Utah found that the policy language defining "insured location" and "any premises used . . . in connection with" the residence premises . . . 'is fairly susceptible to different interpretations,'" <u>Sorensen</u>, 2013 WL 6503310 at *8 (quoting <u>Fire Ins. Exch. v. Oltmanns</u>, 285 P.3d 802, 805 (Utah Ct. App. 2012)), and thus should be construed in favor of coverage.

16. Although the cases cited are not precisely on point because they involved accidents that occurred on locations allegedly used "in connection with" the insured premises, the court finds persuasive the overarching notion that the court must consider the nature of the insureds' use of the property at issue. In this case, the Nivenses were granted unrestricted use of DMD 1 by Mr. and Mrs. Douglas and regularly undertook the activity of caring for cattle on the property. DMD 1, although not contiguous to the Nivens Property, is located a short distance across a country road; at one time, both DMD 1 and the Nivens Property

were part of an original eighty-nine acres that made up the Douglas Property.[8] The use of DMD 1 was consistent with the Nivenses use of the residential premises in a rural community, in that the Nivens Property contained not only their residence, but pens for goats and chickens. In addition, the Nivenses utilized a portion of DMD 2 to pasture their horses. The court concludes that DMD 1 is an insured location under the Policy.

17.    The court finds further that the Nivenses did not, contrary to Plaintiff's argument, rent or lease DMD 1. The handwritten agreement did not change Mr. Nivens' obligations on DMD 1; it simply transferred Mr. Douglas's remaining cows to Mr. Nivens. Tr. 35. Mr. Nivens did not consider the handwritten agreement to be a rental agreement. Tr. 55. Mrs. Douglas did not find the money forwarded to her for the sale of calves to be important, because she could not attend to the cows and relied on Mr. Nivens to do so. See Depo. of Dolly M. Douglas 42, ECF No. 82-3. Mrs. Douglas collected monies from the sales of calves in 2009, 2010, and 2011. Mrs. Douglas ended the agreement with respect to the calves in 2012 because "that was enough." Id. at 26-27. In the court's view, this determination further supports its conclusion that DMD 1 constitutes an insured location.

### III. ORDER

For the reasons stated, the court declares that Plaintiff is required under the Policy to defend Mr. and Mrs. Nivens for any action brought against them for personal injury or property damage arising out of the September 29, 2011 cow/vehicular accident, and that the Policy provides coverage

---

[8]According to Mrs. Douglas, she and Mr. Douglas gave her daughter five acres, the Nivenses five acres, and their granddaughter another five acres. Mrs. Douglas owns the remaining 73 acres. Depo. of Dolly Mae Douglas 49, ECF No. 82-3.

to pay any claim of any person who sustained property damage or bodily injury as a result of the same.  The Clerk of Court shall enter judgment pursuant to Fed. R. Civ. P. 58.

**IT IS SO ORDERED**.


/s/ Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina

September 24, 2014

23